UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

GARY D. GRANT,                    )
                                  )
        Plaintiff,                )        Civil No. 6:19-cv-00165-GFVT-HAI
                                  )
v.                                )
                                  )        **MEMORANDUM OPINION**
TROOPER DREW WILSON, *et. al.*,   )        **&**
                                  )        **ORDER**
        Defendants.               )

*** *** *** ***

A man was shot and killed inside his home after police officers entered the residence and found the man wielding a shotgun. At issue is whether the officers were permitted to enter the residence in the first place and whether, given the circumstances, the action of shooting the man constituted the use of excessive force. These issues are at the heart of Defendants' Motion for Summary Judgment that was filed on January 6, 2021. For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.

**I**

On May 20, 2018, Defendant Drew Wilson, a Kentucky State Police officer, was called to the Harlan Area Regional Hospital to investigate allegations of sexual and criminal abuse of a two-year-old child. [R. 1 at 3; R. 17-1 at 2.] Upon being shown photos of multiple cigarette burns on the child's legs, bruises covering his body, and "fingerprint bruises" on his neck and face, Trooper Wilson contacted the detective on call that weekend, Aaron Frederick, and asked Detective Frederick to come to the hospital. [R. 27 at 2.] Trooper Wilson interviewed the child's mother and grandmother, who were both present at the hospital. *Id.* Erica Letanosky, the child's mother, informed Trooper Wilson that she believed her boyfriend William "Devin"

Farley was the only person who could be responsible for the child's injuries.  [*Id.*; Letanosky Recording, 7:48–7:59.]

Once Detective Frederick arrived at the hospital, he also briefly spoke with Ms. Letanosky who also told Detective Frederick that Mr. Farley was responsible and that he had an outstanding warrant for his arrest.  *Id.*  Ms. Letanosky also stated that the only places Mr. Farley generally stayed other than her house were his mom's house or a friend's house.  [R. 1 at 3; R. 17-1 at 3.]  Ms. Letanosky agreed to accompany Detective Frederick and Trooper Wilson to "multiple locations where Devon Farley *might* be located. The closest location to the hospital was 328 Country Estates Road."  [R. 28-6 at 2; R. 27 at 3.]  This address was the home of Mr. Farley's mother and stepfather.[1]  [R. 27 at 3.]  Before leaving the hospital, Trooper Wilson contacted dispatch and received basic information about Mr. Farley including his name and date of birth.  [R. 28-9 at 11.]  Although Trooper Wilson would "normally based on circumstances" have asked for a physical description of Mr. Farley, he stated that he did not do so on this occasion because he had Mr. Farley's girlfriend, Ms. Letansoky, in the car with him.  *Id.*  Trooper Wilson and Ms. Letanosky rode together and Detective Frederick followed, so that a marked State Police car would be the first car seen when the cars pulled up to the residence.  [R. 17-1 at 3.]

As the cars pulled into the driveway, Detective Frederick observed Bradley Grant pressure washing the second story porch, though Detective Frederick did not know who the man was at the time.  [R. 1 at 3; R. 17-1 at 3.]  Upon seeing the vehicles pull into the driveway, Mr. Grant quickly put down the pressure washer and went into the house.[2]  Plaintiff states that at this

---

[1] Mr. Farley's parents, in a statement to the police, stated that it was not common for Mr. Farley to come visit them, and that he did not live with them at the house.  [R. 28-8 at 24.]

[2] On May 22, 2018, Detective Frederick stated that upon seeing the cars pull into the driveway, Mr. Grant tossed the pressure washer down and did "a brisk walk/run around the side of the house."  [R. 28-2 at 25.]  Two years later,

point Ms. Letanosky told Trooper Wilson, "that's uh, that's Brad, that's not [Farley]." [R. 27 at 4; R. 28-5 at 15–16.] However, Trooper Wilson avers that Ms. Letanosky indicated that she was not certain whether the man running was Mr. Farley, that she never explicitly stated that the man was not Mr. Farley, and that both Defendants thought the man running was Mr. Farley. [R. 17-1 at 3–4.] Detective Frederick later stated that Trooper Wilson told him, "I don't know if this is our guy…I don't know, [Ms. Letanosky] said 'that might not be our guy,' but it could be." [R. 28-2 at 31.]

Detective Frederick and Trooper Wilson, without permission or a warrant, then entered the residence through the front door and started clearing the house. [R. 17-1 at 5.] After allegedly hearing movement below, the Defendants proceeded downstairs. [R. 17-1 at 5; R. 27 at 6.] Upon finding a locked door under the stairs, Detective Frederick kicked the door open and saw the man they had previously seen pressure washing outside the house, and he was holding a shotgun. [R. 17-1 at 5; R. 27 at 6.] Detective Frederick then shouted that he was with the Kentucky State Police and ordered Mr. Grant to drop the gun. [R. 1 at 4; R. 17-1 at 5.] Detective Frederick additionally stated that Mr. Grant was holding the shotgun to his chin with his finger on the trigger, was telling Detective Frederick to shoot him, and was slowly moving diagonally toward Detective Frederick. [R. 17-1 at 5–6; R. 27 at 7.] When Mr. Grant did not drop the gun and allegedly continued to close the gap between Detective Frederick and himself, Detective Frederick fired several shots at Mr. Grant in quick succession. [R. 17-1 at 7; R. 27 at 7.]

After the shooting, Detective Frederick ran to his car to retrieve a first aid kit and Trooper

during his deposition on August 14, 2020, Detective Frederick stated that upon seeing the cars pull into the driveway, Mr. Grant "threw the pressure washer down, and took off running around the side of the house." [R. 28-11 at 9.]

Wilson reported the shooting and called for an ambulance.  [R. 17-1 at 7.]  Before Mr. Grant died, he thanked the Defendants and said that by shooting him they "did what [he] wanted" because he "didn't have a life worth living" and when asked who he was informed Defendants that he was "Brad."  [R. 27 at 8.]

On July 15, 2019, Gary D. Grant, as administrator of Bradley Grant's Estate, filed a Complaint against Trooper Wilson and Detective Frederick in their individual capacities seeking monetary damages under 42 U.S.C. § 1983 and state tort law stemming from the fatal shooting of Mr. Grant.  [R. 1.]  On January 6, 2021, Defendants filed a Motion for Summary Judgment, arguing that entry into the home was justified by both outstanding arrest warrants and exigent circumstances; that Detective Frederick's use of force was in self-defense and was reasonable under the Fourth Amendment; that Plaintiff's state-law claims of assault and battery fail as a matter of law; and that the defendants are entitled to qualified immunity.  [R. 17-1.]  This matter, having been fully briefed by the parties, is now ripe for review.

## II

### A

Summary judgment is appropriate when the pleadings, discovery materials, and other documents in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986).  "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'"  *Olinger v. Corp. of the Pres. of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  The moving party bears the initial burden of demonstrating the basis for its motion and

identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating there is a genuine issue in dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).

The Court then must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251–52). In making this determination, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

**B**

In the Complaint, Mr. Grant alleges that two § 1983 violations occurred: (1) unlawful warrantless entry and search, and (2) excessive force.[3] [R. 1 at 5.] A plaintiff may bring a private right of action under § 1983 "against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statutes." *Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011) (citing *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)).

---

[3] Plaintiff alleges a third § 1983 violation in the Complaint, which is a failure by Trooper Wilson to intervene. [R. 1 at 7.] However, Defendants do not address or even acknowledge this alleged violation in their Motion for Summary Judgment, and it therefore will not be addressed here.

**a**

Plaintiffs argue that Defendants' entry into the home violated the Fourth Amendment because the officers lacked a warrant, probable cause, and exigent circumstances. [R. 1 at 5.] The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. It is a fundamental tenant of the Fourth Amendment that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Baker v. City of Trenton*, 936 F.3d 523, 530 (6th Cir. 2019) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980)). "[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* Therefore, absent consent, a warrant, or exigent circumstances, the Fourth Amendment prohibits a police officer from entering a home. *Coffey v. Carroll*, 933 F.3d 577, 585 (6th Cir. 2019) (citing *Cummings v. City of Akron*, 418 F.3d 676, 685 (6th Cir. 2005)).

"Exigent circumstances are situations where real[,] immediate[,] and serious consequences will certainly occur if the police officer postpones action to obtain a warrant." *Baker*, 936 F.3d at 530 (quoting *Thacker v. City of Columbus*, 328 F.3d 244, 253 (6th Cir. 2003)). In the warrantless entry context, there are four recognized exigent circumstances: "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *Id.* (quoting *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996)).

Here, Defendants contend in their Motion for Summary Judgment that entry into the house was justified by outstanding arrest warrants of both Mr. Grant and Mr. Farley and the hot pursuit exigent circumstance. [R. 17-1 at 8.] In the alternative, Defendants argue that their

actions were protected under qualified immunity. None of Defendants' arguments carry the day.

**1**

Defendants first argue that because Mr. Grant had an outstanding warrant for his arrest, Mr. Grant's Fourth Amendment interest was not harmed by Officer Wilson and Detective Frederick's entry into the home located at 328 Country Estates Road. [R. 17-1 at 9.] Defendants rest their argument primarily on the following facts: (1) Mr. Grant lived at 328 Country Estates Road; (2) Mr. Grant had a warrant out for his arrest; and (3) an arrest warrant permits officers "to enter a suspect's own residence to effect his arrest." *Id.* (quoting *Steagald v. United States*, 451, U.S. 204, 221 (1981)). In the Fourth Amendment context, courts must conduct an objective reasonableness inquiry that does not rely on "the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *Baker*, 936 F.3d at 530 ("We use an objective test to analyze the circumstances that gave rise to a warrantless entry.").

Here, the fact that Bradley Grant had an outstanding warrant for his arrest did not permit entry into the home. At the time of entry, the officers were looking for Devin Farley, not Bradley Grant. When the officers chose to pursue Mr. Grant and entered the home, they did not know the identity of who they were pursuing. [R. 29-2 at 46; R. 28-9 at 49.] Further, the Defendants did not learn that Mr. Grant had an outstanding warrant for his arrest, or even learn that it was Mr. Grant they had been chasing, until after the Defendants had entered the home and Mr. Grant had been shot. [R. 28-2 at 43; R. 28-9 at 20.] In this case, Defendants cannot rely on facts that they learned after entering the home to justify their entry in the first place, as courts "must consider only the facts the officers knew at the time of the alleged Fourth Amendment violation." *Dickerson v. McClellan*, 101 F.3d 1151, 1155 n.3 (6th Cir. 1996); *see also Hernandez v. Hansell*, 2016 WL 8943279, at *1 n.3 (M.D. Fla. July 11, 2016) ("Any information

the Deputies learned after the incident is not relevant because it was not known to the Deputies when the alleged constitutional violations occurred." (citing *Brown v. City of Huntsville*, 608 F.3d 724, 736 (11th Cir. 2010)).  Objectively, given the facts and what the Defendants knew at the time they entered the home, the Defendants cannot rely on the fact that Mr. Grant had an outstanding warrant for his arrest to justify entry, and this argument fails.

## 2

Defendants next argue that because Devin Farley had an outstanding warrant for his arrest, it was appropriate for Officer Wilson and Detective Frederick to enter the home located at 328 Country Estates Road.  [R. 17-1 at 9.]  The Supreme Court held in *Payton v. New York* that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." 445 U.S. 573, 603 (1980).  However, absent exigent circumstances or consent, an arrest warrant does not permit police to enter the home of a third party.  *Steagald v. United States*, 451 U.S. 204 (1981).

Several factors point to the fact that the Country Estates Road residence was not Mr. Farley's home and was instead the home of a third party: (1) the address listed on Mr. Farley's arrest warrant is for a residence in Evarts, Kentucky, not for the home located on Country Estates Road; (2) Ms. Letanosky told Officer Wilson that Mr. Farley lived with her in Lynch, which is not the residence on Country Estates Road; and (3) Ms. Letanosky agreed to go with the Defendants to multiple locations where Mr. Farley *might* be located, one of which was the Country Estates Road residence.  [R. 25-5 at 6; R. 28-6 at 2; R. 28-10.]  These facts indicate that the Country Estates Road residence was not Mr. Farley's home.[4]  Thus, Defendants must

---

[4] Furthermore, viewing the facts in the light most favorable to the nonmoving party, Defendants arguably lacked a good reason to believe the person they were pursuing into the house was Mr. Farley, as required by *Payton*, given

demonstrate either consent or exigent circumstances to enter the Country Estates Road home because it belonged to a third party. Defendants do not argue that they had consent to enter the residence, and as will be discussed in greater detail below, Defendants also lacked exigent circumstances permitting entry.

### 3

Defendants also argue that their actions in entering the home were justified by exigent circumstances under the hot pursuit exception. [R. 17-1 at 9.] "Typically, hot pursuit involves a situation where a suspect commits a crime, flees and thereby exposes himself to the public, attempts to evade capture by entering a dwelling, and the emergency nature of the situation necessitates immediate police action to apprehend the suspect." *Cummings*, 418 F.3d at 686.

The "hot pursuit" exception was established in *Warden v. Hayden*, 387 U.S. 294 (1967), where an eyewitness saw a suspect to an armed robbery run into a house, the eyewitness called the police, and the police arrived within minutes to search the house. *Smith v. Stone*, 2000 WL 687672, at *5 (6th Cir. May 19, 2000). "[A] suspect may not defeat an arrest which has been set in motion in a public place … by the expedient of escaping to a private place." *Id.* (quoting *United States v. Santana*, 427 U.S. 38, 43 (1976)). "The 'pursuit' begins when police start to arrest a suspect in a public place, the suspect flees and the officers give chase." *Coffey*, 933 F.3d at 586; *see also Smith v. Stoneburner*, 716 F.3d 926, 931 (6th Cir. 2013). Further, it is the "emergency nature of a situation" that turns "an ordinary pursuit into a 'hot' one" and necessitates "immediate police action." *Coffey*, 933 F.3d at 586 (quoting *Cummings*, 418 F.3d at 686).

Defendants state that they knew upon arrival that 328 Country Estates Road was the

---

Ms. Letanosky's statement to Trooper Wilson that the person pressure washing outside the house was "Brad" and "not [Farley]." [R. 27 at 4; R. 28-5 at 15–16.]

home of Mr. Farley's parents and that if Mr. Farley saw the officers, he would likely run. [R. 28-2 at 23; R. 28-9 at 10, 14.] Further, the Defendants argue that police may stop a person they reasonably believe to be a criminal suspect to confirm they are indeed the suspect and that flight is a factor in determining reasonable suspicion. [R. 17-1 at 10–11.]

However, the facts do not indicate that this was a "hot pursuit" situation. In the "hot pursuit" context, a pursuit begins "when police start to arrest a suspect in a public place, the suspect flees and the officers give chase." *Stoneburner*, 716 at 931 (citing *Cummings*, 418 F.3d at 686). Here, although Mr. Grant entered the house when he saw the police cars coming up the driveway, no one had yet made any attempt to arrest Mr. Grant. *See Brenay v. Schartow*, 709 F. App'x 331, 335 (6th Cir. 2017) (finding that there is no hot pursuit "[u]nless and until [an officer] imitate[s] an arrest"). Any pursuit the Defendants were making here was not pursuit following an attempted arrest in a public place, as required by the hot pursuit exigent circumstance. *See Coffey*, 933 F.3d at 586 (finding that because "the officers encountered [the defendant] for the first time after they entered the home," there was no hot pursuit).

Furthermore, there is no evidence that this was an emergency situation that necessitated immediate action. As the Defendants drove up to the home, Mr. Grant was pressure washing outside the house. [R. 1 at 3; R. 17-1 at 3.] When Mr. Grant saw the officers approaching, he did a "brisk walk/run around the side of the house." [R. 28-2 at 25.] While Mr. Grant's actions were admittedly somewhat suspect, the facts do not demonstrate that this was an emergency situation requiring immediate police action as required under the hot pursuit exigent circumstance. *See Coffey*, 933 F.3d at 586. This is particularly true, viewing all facts in favor of the nonmoving party, given Ms. Letanosky's statement that she told Trooper Wilson upon pulling into the driveway that the person he saw pressure washing beside the house was not Mr.

Farley. [R. 28-5 at 15–16.] Therefore, the Court finds that entry into the home was not justified by the "hot pursuit" exigent circumstance.

4

The Court now turns to whether Defendants are entitled to qualified immunity on the unlawful entry claim. Federal qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and internal quotation marks omitted). When evaluating such claims, courts generally apply a two-step analysis. First, the court must consider whether "[t]aken in a light most favorable to the party asserting the injury, [] the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the court asks whether the right at issue was "clearly established." *Id.* "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). "The burden of convincing a court that the law was clearly established rests squarely with the plaintiff." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) (citation and internal quotation marks omitted).

Although at one time courts were required to follow these steps sequentially, the Supreme Court has abandoned that position and now permits courts to "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

Defendants argue that no law specifies that Defendants violated Mr. Grant's clearly established rights by following him into the home when they thought he was Mr. Farley. [R. 17-

11

1 at 21.]  However, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton*, 445 U.S. at 586 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)); *see also Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) ("It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.").  Absent a warrant or consent, searches or seizures inside a home are upheld only in light of extraordinary circumstances.  *Cummings*, 418 F.3d at 685.  As discussed above, Defendants did not have a warrant to search the home, consent to enter the home, or extraordinary circumstances justifying entry into the home.  Therefore, because the Defendants' entry into the home was "unsupported by a warrant, consent or exigent circumstances based upon the hot pursuit of a fleeing felon, the officers deprived [Mr. Grant] of his constitutionally protected right to refuse entry into his home, and to be free from an unreasonable seizure of his person."  *Id.* at 687.

Having determined that Mr. Grant's Fourth Amendment rights were violated, the Court must now determine whether those rights were clearly established at the time the Defendants entered the home.  "A right is clearly established if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Hearring v. Sliwowski*, 712 F.3d 275, 279–80 (6th Cir. 2013) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "[T]he question is whether the defendants had 'fair warning' that their actions were unconstitutional."  *Cummings*, 418 F.3d at 687 (citing *Hope v. Pelzer*, 536 U.S. 730, 736 (2002)).

Here, Supreme Court precedent demonstrates that Mr. Grant's constitutional rights were clearly established.  *Payton* and *Welsh* both stand for the proposition that under the Fourth Amendment, searches and seizures inside a home without a warrant are presumptively

unreasonable. *Id.* This is particularly true where, as here, entry was not supported by the hot pursuit exigent circumstance and evidence indicates that the Defendants knew or should have known that the man they were chasing was not the person they were after. [*See* R. 28-5 at 15–16.] Ms. Letanosky states that she told Trooper Wilson upon pulling into the driveway that the person who was pressure washing beside the house was not Mr. Farley. *Id.* Furthermore, Trooper Wilson told Detective Frederick that he was not sure whether the person they were pursuing was "[their] guy" but pursued him into the house anyway. [R. 28-2 at 31.] Given the facts, "a reasonable official would understand" that Defendants entering the home without consent, a warrant, or an exigent circumstance violated Mr. Grant's Fourth Amendment rights. *Hearring*, 712 F.3d at 279–80. Therefore, the Court finds that the Defendants are not entitled to qualified immunity as to the unlawful warrantless entry and denies summary judgment on this issue.

**b**

The Court now turns to whether Detective Frederick's use of force was reasonable under the Fourth Amendment. The use of force is a separate and distinct issue from the warrantless entry issue analyzed above. *See County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1544 (2017) ("A different Fourth Amendment violation cannot transform a later, reasonable use of force into an unreasonable seizure."); *Chappell v. City of Cleveland*, 585 F.3d 901, 914 (6th Cir. 2009) (collecting cases holding that events leading up to a shooting "are not a factor in determining whether the detectives had probable cause to use deadly force"); *see also Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) ("[T]he court should first identify the 'seizure' at issue here and then examine whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for police to create the

circumstances.").

The Fourth Amendment provides that individuals have a right to be free from excessive force during a seizure. *Jordan v. Howard*, 987 F.3d 537, 543 (6th Cir. 2021). "[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Evaluating whether the force used to effect a seizure is reasonable under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual Fourth Amendment interests against the countervailing governmental interests at stake." *Jordan*, 987 F.3d at 543 (quoting *Graham v. Connor*, 490 U.S. 386, 396) (1989)).

Whether the use of deadly force is reasonable to subdue a suspect depends on whether "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* (quoting *Garner*, 471 U.S. at 11). This is an objective test that requires a court to adjudge "the use of force from the perspective of a reasonable officer on the scene, 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019) (quoting *Graham*, 490 U.S. at 396). In evaluating the totality of the circumstances, the Supreme Court has provided a list of non-exclusive factors for courts to consider: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Graham*, 490 U.S. at 396). Courts may address all the factors or focus particularly on one of them. *See Jordan*, 987 F.3d at 543 ("we are primarily focused on the second factor—whether the suspect poses an immediate threat to the safety of the officers or others").

Here, as in *Jordan*, the Court is primarily concerned with whether Mr. Grant posed an immediate threat to the safety of the Defendants or others. The Defendants argue that Mr. Grant posed an immediate threat and therefore Detective Frederick's actions were taken in self-defense and objectively reasonable. [R. 17-1 at 17.] Police shootings are grave matters that must be carefully considered, and a thorough review of the record indicates that Detective Frederick's use of deadly force in this case was objectively reasonable.

It is undisputed that in the seconds-long encounter between Mr. Grant and Detective Frederick, Mr. Grant was holding a shotgun with the barrel pointed up at his own chin, Mr. Grant's finger was in the trigger well, Mr. Grant was no more than fifteen feet (and possibly less than ten feet) away from Detective Frederick, and Mr. Grant was telling Detective Frederick "shoot me. Shoot me." [R. 17-1 at 5; R. 27 at 6–8.] Detective Frederick additionally testified that Mr. Grant was "rocking back and forth" and would not stop moving diagonally toward Detective Frederick, though Plaintiff contests whether Mr. Grant was in fact moving toward Detective Frederick. [R. 28-11 at 14.]

The Plaintiff makes three primary arguments as to why Detective Frederick's use of force was not justified: (1) Mere possession of a gun without more does not justify the use of deadly force; (2) Whether Mr. Grant was moving toward Detective Frederick or not is disputed; and (3) Detective Frederick's reliance on *Thornton v. City of Columbus* is misplaced. [R. 27 at 19, 22, and 25.] However, none of these arguments are persuasive. Furthermore, Detective Frederick's use of force is protected by qualified immunity.

**1**

First, although Plaintiff is correct that possession of a gun without more does not justify the use of deadly force by police, that is not the situation here. *See Thomas v. City of Columbus*,

854, F.3d 361, 366 (6th Cir. 2017) ("Whether a suspect has a weapon constitutes just one consideration in assessing the totality of the circumstances.").  In this case, not only did Mr. Grant have a shotgun, but he was in a confined area with Detective Frederick, his finger was on the trigger, the gun barrel was facing upwards and could easily have been shifted to fire at Detective Frederick without a full second's notice, and Mr. Grant was arguably also moving towards Detective Frederick and "closing the gap."  [R. 17-1 at 5; 27 at 19.]  Although Plaintiff argues that because Mr. Grant did not point the shotgun at Detective Frederick there was no immediate threat, the Sixth Circuit has held that an officer does not have to wait until a weapon is raised or pointed at them before using deadly force.  *See Thornton v. City of Columbus*, 727 F. App'x 829, 838 (6th Cir. 2018) (citing *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001)).  Further, Mr. Grant did not need to make any verbal threats towards Officer Frederick to pose "an immediate threat to the safety of [Detective Frederick]."  *Reich*, 945 F.3d at 978 (citing *Graham*, 490 U.S. at 396).

Additionally, whether Mr. Grant heard Detective Frederick tell him to put the gun down or had time to respond to Detective Frederick's commands does not change the Court's analysis. This is because the inquiry here is focused on whether Mr. Grant's actions "gave rise to a reasonable perception of danger," instead of focusing on what the victim may have thought or heard.  *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 840 (6th Cir. 2018) (quoting *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 350 (6th Cir. 2007)).

Plaintiff's argument that Mr. Grant's mental health "must be taken into account when consider[ing] Frederick's use of force" [R. 27 at 20] is likewise unpersuasive.  Plaintiff relies on *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004), and *Griffith v. Coburn*, 473 F.3d 650 (6th Cir.), which cites to *Champion*.  [R. 27 at 20.]  However, *Champion* stands for the

proposition that "[t]he diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted." 380 F.3d at 904. Further, in *Champion*, the officers "were confronting an individual whom they knew to be mentally ill." *Id.* Here, Detective Frederick was facing an individual who was wielding a shotgun, and Detective Frederick also had no indication going into the confrontation that Mr. Grant was suffering from any kind of mental disability. Even if Detective Frederick had known that Mr. Grant was suffering from a mental disability, a police officer is permitted to use deadly force when he has "probable cause to believe that a mentally ill person poses an imminent threat of serious physical harm to [his] person[.]" *Rucinski v. County of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2016).

Finally, even if in hindsight it is determined that Detective Frederick could have escaped safely back up the stairs, the facts demonstrate that he was forced to make a split-second decision to use deadly force when confronted with a man wielding a shotgun in close quarters, and "officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed." *Untalan v. City of Lorain*, 430 F.3d 312, 315–16 (6th Cir. 2005); *see also Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015). Ultimately, Plaintiff's first argument, that mere possession of a gun without more does not justify the use of deadly force, is not applicable in this case and therefore fails.

## 2

Second, Plaintiff argues that it is disputed whether Mr. Grant was actually moving toward Detective Frederick. Detective Frederick told investigators that Mr. Grant was "closing the gap" by taking baby steps and moving in a diagonal direction toward Detective Frederick. [R. 28-11 at 14.] However, Plaintiff argues that based on physical evidence, Mr. Grant's entry and exit wounds, and Plaintiff's shooting reconstruction expert, a jury could reasonably infer from the

evidence that Mr. Grant was "standing stationary, facing the right corner of the room, away from Frederick." [R. 27 at 24.]

However, the physical evidence is actually fairly consistent with Officer Frederick's statement of the events. First, the Plaintiff's reconstruction expert determined that Officer Frederick was approximately ten feet from Mr. Grant when Officer Frederick fired. [R. 28-21 at 4.] Other physical evidence demonstrates that Officer Frederick may have been eight to fifteen feet away from Mr. Grant. [R. 28-17 at 12.] Therefore, the range of distance between Mr. Grant and Detective Frederick varies from Detective Frederick's initial estimate by as little as three feet. [R. 37 at 16.] Further, the physical evidence demonstrates that Mr. Grant was upright and angled toward Detective Frederick, as Detective Frederick described. *Id.* As Defendants point out, Plaintiff states that a jury could "reasonably infer form the above evidence" that Mr. Grant was facing away from Detective Frederick, but the evidence supports Detective Frederick's original statement that Mr. Grant was diagonal to Detective Frederick. [R. 28-11 at 14.] Ultimately, none of the physical evidence directly contradicts Detective Frederick's statement of the event.

However, even if there was a question as to whether Mr. Grant was "closing the gap" between himself and Detective Frederick, the facts still demonstrate that Mr. Grant was holding a shotgun, Mr. Grant had his finger on the trigger, the gun was pointed upward and could easily have been pointed and discharged toward Detective Frederick in a moment, Mr. Grant was approximately ten feet from Detective Frederick, and he was acting erratically. All of these facts, even apart from whether Mr. Grant was moving toward Detective Frederick, would lead a reasonable officer to conclude that there is "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Jordan*, 987 F.3d at 543

(quoting *Garner*, 471 U.S. at 11). Accordingly, this argument also fails.

**3**

Plaintiff also argues that Defendants' reliance on the Sixth Circuit's *Thornton* opinion is misplaced. In *Thornton*, police were called to a private residence because a man had allegedly pointed a gun at a young man and his friends. 727 F. App'x at 830. A few minutes after the police arrived and posted up around the front door of the residence, the officers saw a man inside the house holding a shotgun, walking diagonally toward them with his finger on the trigger, and with the barrel of the shotgun "angled upward and slightly to [the officer's] right." *Id.* at 831. When the man was within approximately fifteen feet of the officers, the officers loudly ordered the man to drop the weapon. *Id.* When the man did not comply, the officers opened fire, hitting the man three times. *Id.* The district court found that the officers' use of force was not a violation of the Fourth Amendment, arguing that given the factual predicate, the use of force was justified. *Id.* at 837.

Contrary to the Plaintiff's averments, there are a number of similar facts between the two cases. For instance, both involved police officers encountering the following: (1) a man with a shotgun; (2) the shotgun was pointing up; (3) a man standing and/or moving diagonally toward the officers; (4) a man was within fifteen feet of the officer who shot him; and (5) the gun was not pointed directly at the officer. Even though *Thornton* is not factually identical to this case, the factual similarities make it reasonable for the Defendants to look to the *Thornton* opinion for support, and Plaintiff's argument is therefore without merit.

**4**

Furthermore, Detective Frederick's actions are protected by qualified immunity. As described above, qualified immunity "protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (citation and internal quotation marks omitted). Excessive force claims involving the "seizure" of a citizen are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Reich*, 945 F.3d at 978 (citing *Graham*, 490 U.S. at 392). "An officer's use of deadly force is objectively reasonable if 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Id.* (citing *Garner*, 471 U.S. at 11). The Court must "construe the evidence and draw all reasonable inference in [Mr. Grant's] favor but, because this case concerns qualified immunity, consider 'only the facts that were knowable to the defendant officers.'" *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 550 (2017)).

Here, the Court can resolve this issue on the question of whether Detective Frederick engaged in a constitutional violation. In *Thornton*, discussed above, the Sixth Circuit found that the defendant police officers were entitled to qualified immunity when they shot a man who was inside his own residence, wielding a shotgun not pointed at the officers, and was within fifteen feet of the officers. 727 F. App'x at 837. The facts demonstrate that Detective Frederick found himself in an enclosed space within fifteen feet of a man wielding a shotgun who had his finger on the trigger with the barrel pointing up, and who was also arguably approaching Detective Frederick at a diagonal angle. Qualified immunity is available "where officers make split-second decisions in the face of serious physical threats to themselves and others." *Mullins*, 805 F.3d at 766–67. Given the particular facts in this case, which are similar to *Thornton*, and "analyzing the use of force from the perspective of a reasonable officer on the scene," the Court finds that Detective Frederick's use of force in this particular instance was justified. *Id.*; *see also Livermore ex rel Rohm*, 476 F.3d at 404.

Because the Court finds no violation of a constitutional right, it is therefore unnecessary to proceed past the first step of the qualified immunity analysis. *See Sumpter v. Wayne Cty.*, 868 F.3d 473, 480 (6th Cir. 2017) (discussing that a plaintiff must satisfy both prongs of the qualified immunity analysis to defeat an assertion of qualified immunity) (citing *Wesley v. Campbell*, 779 F.3d 421, 428–29 (6th Cir. 2015)). Accordingly, Detective Frederick is protected by qualified immunity.

## C

In the Complaint, Mr. Grant also brings a claim for assault and battery against Detective Frederick. [R. 1 at 7.] Mr. Grant argues that "[t]he use of excessive force by a police officer constitutes the intentional tort of battery." [R. 27 at 29 (quoting *Ali v. City of Louisville*, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 15, 2006).] However, Detective Frederick argues that he is entitled to qualified immunity on Plaintiff's state law assault and battery claims.[5] [R. 17-1 at 23.] The Court finds that Detective Frederick's use of force is protected under qualified immunity.

In Kentucky, qualified immunity protects all public officials from suit except for those who are "plainly incompetent or those who knowingly violate the law." *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). Qualified immunity attaches to public officers sued in their individual capacities performing (1) discretionary acts or functions; (2) in good faith; and (3) within the scope of the employee's scope of authority. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Discretionary acts are

---

[5] In the Complaint, Mr. Grant brought claims of assault and battery and negligence. [R. 1 at 7–8.] However, Defendants do not address or even acknowledge the negligence count in their Motion for Summary Judgment, and it therefore will not be addressed here. Further, Plaintiff argues that Detective Frederick committed a battery through "unwanted touching" of Mr. Grant and appears to drop the assault claim altogether. [R. 27 at 27.] Regardless, the Court finds that the Defendant is entitled to qualified immunity on both the assault and battery claim.

"those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Id.*

It is well established that a police officer's decision of how much force is required in a particular situation is a discretionary act. *See Casey v. Sanders*, 2018 WL 3078758, at *8 (E.D. Ky. Jun. 21, 2018) (collecting cases finding that police officers' use of force in various contexts were discretionary acts). Therefore, Officer Frederick's use of force in this situation constitutes a discretionary act.

Because Detective Frederick's actions were discretionary, the burden shifts to Mr. Grant to establish that the act was not performed in bad faith. Bad faith "can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position" or be a willful or malicious intent to harm. *Yanero*, 65 S.W.3d at 523. The good faith inquiry has both an objective and a subjective component. *Reich*, 945 F.3d at 983. Objectively, a court must ask whether an officer's conduct demonstrates "a presumptive knowledge of and respect for basic, unquestioned constitutional rights." *Id.* (quoting *Bryant v. Pulaski Cty. Detention Ctr.*, 330 S.W.3d 461, 466 (Ky. 2011). Subjectively, a court must ask whether the officer behaved with "permissible intentions. *Id.*

Here, Plaintiff does not argue that Detective Frederick behaved with impermissible intentions, but instead argues that the analysis regarding the battery claim "tracks the reasoning for denying qualified immunity for Grant's excessive force claim." [R. 27 at 28.] However, the facts in this case demonstrate that Detective Frederick is entitled to qualified immunity on the excessive force claim, and under Kentucky law, a battery claim must fail where a police officer's conduct is deemed objectively reasonable in the § 1983 context. *See Atwell v. Hart Cty.*, 122 F.

App'x 215, 219 (6th Cir. 2005). Ultimately, Detective Frederick was engaged in a discretionary act, made in good faith, and within the scope of his employment and authority. Therefore, Detective Frederick is entitled to qualified immunity on the assault and battery claims.

### III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendant's Motion for Summary Judgment **[R. 17]** is **GRANTED** in part and **DENIED** in part as follows:

   a. Defendants' Motion for Summary Judgment as to Plaintiff's Unlawful Warrantless Entry and Search claim under 42 U.S.C. § 1983 is **DENIED**;

   b. Defendants' Motion for Summary Judgment as to Plaintiff's Excessive Force claim under 42 U.S.C. § 1983 is **GRANTED**; and

   c. Defendants' Motion for Summary Judgment as to Plaintiff's Assault and Battery claims is **GRANTED**.

This the 24th day of June, 2021.

Gregory F. Van Tatenhove
United States District Judge